**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ZERBINETTA NICHOLS, | ) | |
| | ) | |
| Plaintiff-Claimant, | ) | |
| | ) | No. 11-cv-7699 |
| v. | ) | |
| | ) | Jeffrey T. Gilbert |
| CAROLYN W. COLVIN, Acting | ) | Magistrate Judge |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant-Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

## I. BACKGROUND FACTS

This matter is before the Court on Claimant's motion for summary judgment

[Dkt.#20]. Claimant Zerbinetta Nichols ("Claimant") brings this action under 42 U.S.C

§405(g), seeking reversal or remand of the decision by Defendant Carolyn W. Colvin,[1]

Acting Commissioner of Social Security ("Commissioner"), denying Claimant's applications

for Disability Insurance Benefits. Claimant raises the following issues in support of her

motion: (1) whether the Administrative Law Judge ("ALJ") failed to follow the treating

physician rule; and (2) whether the ALJ properly evaluated Claimant's credibility. For the

reasons set forth below, Claimant's motion for summary judgment is granted, the decision

of the Commissioner of Social Security is reversed, and this matter is remanded to the

Social Security Administration for further proceedings consistent with the Court's

Memorandum Opinion and Order.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security.
Pursuant to Rule 25 of the Federal Rules of Civil Procedure, Carolyn W. Colvin is automatically
substituted as the Defendant-Respondent in the case. No further action is necessary to continue this
suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**A.**     **Procedural History**

Claimant initially filed for Disability Insurance Benefits ("DIB") on July 20, 2009 alleging a disability onset date of October 1, 2008. R. 69, 164. The Social Security Administration ("SSA") denied her application on October 26, 2009. R. 74. Claimant then filed a request for reconsideration on November 23, 2009, which was denied on January 22, 2010. R. 83, 84. On March 1, 2010 Claimant requested a hearing before an ALJ. R. 92.

On April 5, 2011, an ALJ presided over a video hearing at which Claimant appeared with her non-attorney representative. R. 33. Only Claimant and Vocational Expert ("VE") Michelle Peters testified at the hearing. R. 49. No medical testimony was heard.  On April 15, 2011, the ALJ rendered a decision finding that that Claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act. R. 42. The ALJ found that Claimant was capable of doing sedentary work and was not disabled under the Social Security Act. The ALJ found that Claimant had the residual functional capacity ("RFC") to lift and/or carry twenty pounds occasionally and ten pounds frequently; stand/walk for two hours in an eight hour work day; and sit for four hours. R. 36. He disregarded Claimant's treating physician's opinion that Claimant was disabled and could not work because he said that the treating physician's opinion was inconsistent with his own examination notes and the weight of the objective medical evidence. R. 41-2. The ALJ also felt that Claimant was "not fully credible" (R. 39) in describing her own limitations. The ALJ found, based on the testimony of the Vocational Expert, that Claimant was capable of making a successful adjustment to work that exists in the national economy, and therefore was not disabled. R. 48.

Claimant filed a request with the Appeals Council for review of the ALJ's decision, which was declined on August 31, 2011. R. 8-12.  The Appeals Council again declined to review the ALJ's decision on October 26, 2011, rendering it the final decision of the Commissioner. R. 1-6. Claimant seeks review in this Court pursuant to 42 U.S.C § 405(g).

## B.    Hearing Testimony

### 1. Claimant - Zerbinetta Nichols

At the time of the hearing, Claimant was 46 years old and had completed high school. R. 51. Her past relevant work experience was in quality control for Lear Company, branched out of Ford Motor Company and, before that, as a para-professional for North Chicago High School. R. 51-52. Claimant testified that she stopped working in October 2008 because she got sick on the job and her doctor told her that she could no longer preform her duties. R. 51. Claimant also stated that she had to quit another job because she was very fatigued, tired, and short of breath, and this occurred whether she was sitting or standing. R. 52. Claimant stated that she is able to lift ten pounds, and that she is only able to sit for fifteen minutes at a time due to the pain she feels from her spinal stenosis. *Id.* She stated that she can stand for twenty to twenty-five minutes at a time. Claimant testified that she was diagnosed with spinal stenosis in either May or June of 2009, and was treated with physical therapy on two occasions but that ended because she lost her insurance. R. 53.

On an average day, Claimant does housework in fifteen-minute intervals because she becomes tired. Claimant has to take a nap at 12:00 noon because the medication she takes kicks in at that time and makes her drowsy. R. 54. She takes the following medications: Coreg, which is an alpha-beta blocker; Lispinopril, which is an estrogen-converting enzyme inhibitor; Amlodipine, for her high blood pressure; Crestor for her high

cholesterol; and Hydrochlorot which is a water pill. *Id.* Claimant watches television and surfs the Internet. R. 54-55.

Claimant testified that she has not driven a car since 2008 because some of the medications she takes cause dizziness and blurriness, as well as nausea, muscle spasms, shortness of breath and fatigue. R. 55. After fifteen minutes of physical activity Claimant needs to sit down for about thirty minutes. R. 56. Claimant testified that she goes grocery shopping once a month with her fiancée, and that he carries the groceries as well as brings them into the home. R. 57. Claimant testified that she has been seeing Dr. Hamid, a cardiologist, about once a month since 1998. R. 58. Because of her sporadic insurance coverage, however, her treatment with Dr. Hamid has been interrupted. She has to borrow money to continue treatment and pay for her medication out of pocket. R. 59-60.

### 2. Vocational Expert - Michelle Peters

The VE testified that a hypothetical person with Claimant's age, education and past work experience with the following limitations could not perform the Claimant's past relevant work: is able to lift twenty pounds occasionally and ten pounds frequently; sit for four hours at a time and six hours total in a day, stand for thirty minutes at a time; stand and walk a total of two hours a day; continuously reach, can never climb ladders ropes or scaffolds; excluding hazards such as unprotected heights and dangerous moving machinery; occasionally climb ramps and stairs. R. 64-65. The VE further testified that some of the Claimant's skills would be transferable to other jobs, such as office clerical worker, clerk positions, assembly worker, and information clerking position. R. 65. The VE, however, acknowledged that if the hypothetical person had the additional limitation of

requiring one hour of rest during an eight-hour work day (based on the Claimant's testimony) there would be no work available. R.66.

C.    **Medical Evidence**

   **1. Dr. Wallace**

   Medical notes in the record show that on January 16, 2006, Claimant saw Dr. Wallace and complained of shortness of breath and fatigue. R. 311. During that consultation Dr. Wallace noted that a September 2005 cardiac catheterization showed an ejection fraction of 58%. *Id.* On January 24, 2006, an echocardiogram ("ECG") revealed that Claimant's ejection fraction had decreased to 48-51%. R. 283. Claimant reported that she feels fatigued especially with exertion and needs to rest after climbing one flight of stairs before climbing the next. *Id.* Dr. Wallace requested follow up appointments for February, March, May, and June of 2006. R. 289, 292, 295, 301. During each follow up Claimant complained of fatigue and/or chest pain. *Id.* On September 14, 2006, an ECG showed that Claimant's ejection fraction had further decreased to 46%. R. 309.

   On June 29, 2006, Dr. Wallace completed a Physician's Statement for Claimant's temporary disability claim with the Illinois Municipal Retirement Fund. R. 275-80. Dr. Wallace listed familial cardiomyopathy as her primary diagnosis, and listed fatigue, dizziness, and difficulty breathing as her subjective symptoms. R. 275. Dr. Wallace opinioned that Claimant qualified within Class IV of the American Heart Association functional classifications because her symptoms occur even at rest, but still felt that Claimant could return to gainful activity in six to twelve months. [2] R. 280. The "6-12

---

[2] According to the American Heart Association, Cardiac Functional Capacity IV is characterized as cardiac disease resulting in inability to carry on any physical activity without discomfort. Symptoms of heart failure or the anginal syndrome may be present even at rest, and discomfort is increased if

months" option for return to any gainful activity on the form Dr. Wallace filled out was the longest period of time he could choose besides "never." *Id.* Additionally, on August 08, 2006, Dr. Wallace found that Claimant suffered from cervical radiculopathy. R. 303.

**2. Dr. Hamid**

Dr. Hamid has treated Claimant for almost twenty years, and Claimant has seen him monthly to every three months during this time. R. 522. Dr. Hamid provided five opinions on Claimant's condition and residual functional capacity ("RFC"). R. 350-354, 454, 345, 445, 514-515. His treatment notes and opinions are summarized below.

On March 22, 2007, Dr. Hamid found that Claimant suffered from mild cervical spondylosis and spinal stenosis. R. 359. On September 25, 2008, Dr. Hamid ordered an ECG test which showed that Claimant's ejection fraction was between 45-50%. R. 381, 473. The same day an exercise test was performed; Claimant was able to reach 9.40 metabolic equivalents ("METS"), which caused Claimant chest pains, chest pressure, and shortness of breath. The test was terminated after seven minutes and thirty-four seconds for these reasons. R. 475. [3]

On March 24, 2009 Dr. Hamid filled out a medical evaluation and physician's report at the request of the Department of Human Services in regard to Claimant's eligibility for public assistance benefits. R. 350. In the physician's report, Dr. Hamid listed familial cardiomyopathy and hypertension as his diagnoses. R. 351. Her primary symptoms were dyspnea (i.e. shortness of breath) and chest pain. R. 351-352. Dr. Hamid classified

any physical activity is undertaken.
http://my.americanheart.org/professional/StatementsGuidelines/ByPublicationDate/PreviousYears/Classification-of-Functional-Capacity-and-Objective-Assessment_UCM_423811_Article.jsp

[3] The metabolic equivalent (MET) is a commonly used method of quantifying the energy cost and intensity of physical activity.
http://journals.lww.com/jcrjournal/Abstract/2007/05000/A_Re_examination_of_the_Metabolic_Equivalent.4.aspx

Claimant's Cardiac Functional Capacity as III.[4] He listed her ejection fraction from September 25, 2008 as 45-50%, and noted that it was not reversible. R. 352. He stated that Claimant's capacity for walking, stooping, pushing, pulling and gross manipulation was decreased 20-50%. Further, Claimant's capacity for bending, standing climbing, travel and ability to perform activities of daily living had decreased more than 50%. R. 354. Dr. Hamid explained that vacuuming and mopping cause Claimant dyspnea. R. 352.

On June 19, 2009, a myocardial perfusion study showed an ejection fraction of 47% and the test was terminated after eight minutes due to fatigue. Although Claimant was able to reach 10.1 METS, (R. 470) during the test, Dr. Hamid classified Claimant's ejection fraction as mildly impaired and nonreversible. *Id.* One day later, on June 20, 2009, Claimant had an ECG, which showed a borderline ejection fraction, mildly diminished with a 45-50% range. R. 471.

On May 20, 2009 Dr. Hamid wrote another opinion stating that Claimant been under his care for a number of years. R. 454. He stated that she has cardiomyopathy with an ejection fraction of 45%, with the main symptoms being dyspnea and intermittent chest pain. *Id.* He stated that she has a history of familial cardiomyopathy and that he has treated close members of her family, with very adverse outcomes. *Id.* He went on to say, "[l]ooking at the history of this disease pattern in her family, it is likely that this will over a period of time get worse." *Id.* He advised her not to do work involving physical labor, and stated "[a] more sedentary type of job could be done by her for some period of time." *Id.* However he

---

[4] According to the American Heart Association, Cardiac Functional Capacity III is characterized as cardiac disease resulting in marked limitation of physical activity meaning less than ordinary activity causes fatigue, palpitation, dyspnea or anginal pain.
 http://www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Classes-of-Heart-Failure_UCM_306328_Article.jsp

finished the opinion by adding, "[t]he further course of event will determine what she can do or not do." *Id.*

On June 3, 2009, two weeks later, Dr. Hamid delivered another opinion. He found that Claimant is dizzy, and is short of breath during mild activity. R. 345. He felt that, "[s]he is demonstratively worse in terms of symptoms," and opined that she is unable to hold a job, and recommended disability on a long-term basis due to her cardiomyopathy. *Id.*

On December 28, 2009, Dr. Hamid issued another opinion. R. 445. He listed Claimant's conditions as cardiomyopathy, hypercholesterolemia, and hypertension. *Id.* He again listed her functional class as II-III. *Id.* He felt that she is unable to walk because of marked fatigue, tiredness, and shortness of breath. *Id.* He stated that, "[s]he does get intermittent chest pain which is also characteristic of this situation, although the ejection fraction is only mildly diminished." R. 445. He again mentioned that the cardiomyopathy is based on familial cardiomyopathy and that he has treated Claimant's mother, as well as her aunts and cousins for similar problems. *Id.* Dr. Hamid wrote that, "[t]here has been slow, but progressive decrease in her functional capacity." *Id.* He noted that he will try adjusting her medicine, but added, "[o]ur best hope in the long term would be stabilization of her symptoms or a breakthrough in the medicine which is not available at this point in time." R. 445.

On June 17, 2010, an exercise test with nuclear perfusion was administered to Claimant, which showed an ejection fraction of 36%. Claimant reached 11.5 METS during the test but, again, the test was terminated after nine minutes due to dyspnea and generalized fatigue. R. 517.

On December 7, 2010, Dr. Hamid submitted his last opinion. He again stated that Claimant has been his patient for a long time. He supplemented his earlier opinions by going into more detail about Claimant's symptoms. He stated that her primary symptom is shortness of breath, which "comes on exertion on a very short flight of stairs, i.e. five-to-six steps." R. 514. Claimant also "gets short of breath after walking for less than ½ a block." *Id.* As before he noted that she has intermittent discomfort in the chest, and says that it is a sharp pain that is usually related to exertion. *Id.* He stated, "[t]here is a family history of familial cardiomyopathy and I have personally taken care of many of her relatives. I have taken care of her brother and mother with similar cardiomyopathy pictures and other relatives." *Id.* Further, the last time Claimant was admitted to the hospital a stress test showed an ejection fraction of 36%. *Id.* He stated, "[o]verall, data is consistent with nonischemic cardiomyopathy of familial origin." *Id.* His impression was "familial cardiomyopathy between 35-45%" adding that "the cardiac function may have deteriorated since her last visit. *Id.* Dr. Hamid stated that Claimant needs to continue taking her medication, and that she needs preaortic assessments in order to hopefully stabilize her. *Id.* However, he added, "[t]he usual history of these conditions is progressive over a period of time. *Id.*

### 3. Dr. Bautista

On October 13, 2009, Dr. Bautista performed a consultative examination for the Disability Determination Bureau ("DDB"). R. 393-400. During that consultation, Claimant reported that she cleans the house in "15 minute intervals because of fatigue." R. 393. Further, Claimant was unable to do range of motion exercises of the back due to lower back

pain. 394. Dr. Bautista diagnosed Nichols with chronic low back pain since 2007, a history of coronary artery disease, hypertension, and a history of hyperlipidemia. R. 395.

### 4. Dr. Nimmagadda

On October 09, 2010, Dr. Nimmagadda, a non-treating physician, examined Claimant's records, and completed a Physical Residual Functional Capacity Assessment at the request of the SSA. R. 501. In that assessment he concluded that Claimant could perform full sedentary work but she would not be able to perform full light work on a continuous basis. R. 511-12. Dr. Nimmagadda found that Claimant can continuously lift ten pounds, and frequently lift twenty pounds, stand for thirty minutes at a time for two hours total in a day, walk for fifteen minutes at a time, and sit for four hours at a time with a maximum of six out of the day. R. 502-03. Dr. Nimmagadda also said Claimant can never climb ladders or scaffolds, occasionally climb stairs and ramps, and frequently balance, stop, kneel, crouch, and crawl. R. 504. Dr. Nimmagadda felt that Claimant does not need to avoid unprotected heights, moving mechanical parts, or operating a motor vehicle. R. 505. Dr. Nimmagadda also referenced an exercise stress test, presumably the June 19, 2009 test, in which Claimant had an ejection fraction of 50% and had an exercise capacity of 10 METS, concluding that the treating physician's finding that Claimant would have difficulty with gainful employment is not supported by objective fact findings in the file. R. 511. Specifically Dr. Nimmagadda found that Claimant has the "RFC for at least a [sic] full sedentary work." R. 512

**D.     The ALJ's Decision**

On April 15, 2011, the ALJ rendered a decision finding that Claimant was not disabled as defined of the Social Security Act from October 1, 2008, through the date of his decision. R. 42. The ALJ reviewed Claimant's application under the required five-step sequential process. R. 35-36. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since October 1, 2008, the alleged onset date. R. 35. At step two, the ALJ found that Claimant has severe impairments, including cardiomyopathy and stenosis of the cervical spine. *Id.* The ALJ concluded that Claimant's impairments impose more than minimal limitations on her ability to perform basic work-related activities. *Id.*

At step three, the ALJ concluded that Claimant does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526). R. 35.

Next at step four, the ALJ considered Claimant's RFC and concluded that Claimant has "the residual functional capacity to perform less than a full range of light work as defined in 20 CFR 404.1567(a). She can lift twenty pounds occasionally and ten pounds frequently. She can sit for four hours at a time, stand for thirty minutes at a time, and stand and walk for two hours in an eight-hour workday. She can continuously reach, but can never climb ladders, ropes, or scaffolds. She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She should avoid exposure to hazards including dangerous machinery and unprotected heights." R. 36.

In making that RFC determination, the ALJ wrote that he considered "[a]ll symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the

objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4 and 96-7p" and that he considered opinion evidence "in accordance with the requirements of 20CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p." R. 36.

The ALJ concluded that Claimant's "medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." R. 37. Specifically, the ALJ took note of medical evidence from 2006 in which the Claimant reported that her fatigue was somewhat better due to a walking program. *Id.* Additionally, the ALJ noted the September 2008 ECG test which showed an ejection fraction of 45-50% and the subsequent stress test which lasted for seven minutes and showed that she was able to reach 9 METS. The ALJ also referenced Claimant's test in June 2009 in which Claimant exercised for eight minutes, reached 10.1 METS and showed an ejection fraction of 45-50%. R. 38. The ALJ acknowledged the 2010 stress test, which showed an ejection fraction of 35%, however he dismissed it because the reading was still within the "lower range of normal." *Id.* The ALJ found that Claimant stopped going to physical therapy for her back, due to cost constraints. However, he felt that a walking program was beneficial to Claimant and "would not be prohibited on the basis of lack of finances." *Id.*

The ALJ found Claimant's testimony that her "fatigue causes her to be wholly unproductive during the day" was inconsistent with her consultative exam in which she reported, "[t]hat she can do household chores, although at her own pace and is independent with her activities of daily living." R. 39. The ALJ also took into account

Claimant's participation throughout the forty-five minute hearing, which he found to be "meaningful." R. 39. The ALJ concluded that, based on his RFC, Claimant could not perform her past relevant work. R. 41.

Finally, at step five, the ALJ concluded that considering Claimant's age, education, work experience, and RFC, "there are jobs that exist in significant numbers in the national economy that the claimant can perform." *Id.* Therefore, the ALJ determined that Claimant was not under a disability, as defined in the Social Security Act. R. 42.

## II. LEGAL STANDARD

### A. Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C § 405(g). A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel,* 530 U.S. 103, 106-07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id.* Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision. *Nelms v. Astrue,* 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2009). Even when there is adequate evidence in the record to support the decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the

Commissioner's decision lacks evidentiary support or adequate discussion of the issues it cannot stand. *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence to support the findings. *Nelms,* 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing. 42 U.S.C § 405(g).

## B.    Disability Standard

Disability insurance benefits are available to a claimant who can establish she is under a "disability" as defined in the Social Security Act. *Liskowits v. Astrue,* 559 F.3d, 736, 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected ... to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). Under this process, the ALJ must inquire, in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing other work. *Id.* Once claimant has proven she cannot continue her past relevant work due to physical limitations, the ALJ carries the burden to show that other jobs exist in the economy that the claimant can perform. *Schmidt v. Astrue,* 496 F.3d 883, 841 (7th Cir. 2007).

### III. DISCUSSION

Claimant raises the following issues in support of her motion for summary judgment: (1) the ALJ failed to follow the treating physician rule; and (2) the ALJ did not properly evaluate Claimant's credibility.

**A.      The ALJ's Decision Not To Give Controlling Weight To The Opinions Of Claimant's Treating Physicians Is Not Supported By Substantial Evidence**

An ALJ makes a RFC determination by weighing all the relevant evidence of record. 20 C.F.R. § 404.1545(a)(1); Social Security Ruling ("SSR") 96-8p. In doing so, the ALJ must determine what weight to give any opinions of the Claimant's treating physicians. 20 C.F.R § 404.1527. Claimant argues here that the ALJ's decision to credit the non-treating physician over Claimant's treating physicians is not supported by substantial evidence. This Court agrees.

The opinion of a treating physician is given controlling weight if it is well supported by medically acceptable clinical or laboratory diagnostic testing and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p: *Gudgel v.*

*Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). A contradictory opinion of a non-examining physician is not, by itself, sufficient for the ALJ to reject a treating physician's opinion. *Gudgel*, 345 F.3d at 470. Once well-supported contradictory evidence is introduced, however, the treating physician's opinion is no longer controlling but remains a piece of evidence for the ALJ to weigh. *Hofslien v. Barnhart,* 439 F3.d 375, 377 (7th Cir. 2006).  At issue in this case is the ALJ's decision to reject and discount the opinions of Claimant's treating physicians – Dr. Wallace, Dr. Hamid, and even the DDB consulting physician Dr. Bautista who examined Claimant in person – and instead adopt the opinion of non-treating physician Dr. Nimmagadda.

Claimant argues that the ALJ erred in failing to give Dr. Hamid's opinions controlling weight under SSR 96-2p. Claimant argues that medical opinions from a Claimant's treating physician are entitled to special significance and may be entitled to controlling weight on issues concerning the nature and severity of an individual's impairment(s). SSR 96-5p. Further, Claimant notes that a treating physician's opinion "will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case." *Id.*, SSR 96-5p. According to SSR 96-2p, "not inconsistent" is used "to indicate that a well-supported treating source medical opinion need not be supported directly by all of the other evidence as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion. *Id.*

The Commissioner argues that the ALJ properly assessed Dr. Hamid's opinions, consistent with the regulations and SSR 96-2p. The ALJ explained that the several opinions

Dr. Hamid provided conflicted with each other and concluded this was an appropriate reason to give Dr. Hamid's opinion diminished weight.

Upon reviewing the evidence of record, this Court agrees with Claimant that the ALJ's decision to disregard the treating physician's opinions is not supported by substantial medical evidence. They ALJ ignored four opinions submitted by Dr. Hamid, choosing to rely very selectively upon isolated pieces of evidence and language taken out of context instead of examining the medical record as a whole. The supposed conflicts cited by the ALJ do not undercut Dr. Hamid's consistent treatment notes and opinions concerning Claimant's disease, prognosis and limitations.

As discussed previously, Dr. Hamid has treated Claimant for over 20 years. That was almost one-half of Claimant's life at the time of the hearing, and all of her adult life. He submitted five opinions regarding Claimant's condition and RFC. R. 350-354, 454, 345, 445, 514-515. Dr. Hamid consistently documented that Claimant suffers from familial cardiomyopathy, which is characterized by dyspnea, and intermittent chest pain. *Id.* He noted consistently that Claimant's disease pattern, like that of her relatives who Dr. Hamid also treated, would probably worsen over time, and he documented his findings consistent with that diagnosis in Claimant's medical records. R. 289, 292, 295, 299, 301, 303, 305, 324, 457, 456.

In reaching his decision in this case, the ALJ determined that some of Dr. Hamid's records were conflicting and unsupported by the medical evidence. R. 45. Specifically, the ALJ emphasized Dr. Hamid's May 2009 opinion. The ALJ felt that it documented minimal cardiac problems and was consistent with one of Dr. Hamid's medical records from November 2009 in which the Claimant denied chest pain and her cardiomyopathy was

stable. R. 40. Picking one opinion and one medical record culled from a 20-year treatment history is the epitome of "cherry picking" the medical record, which an ALJ is not allowed to do, *Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir. 2011), and it undercuts the requirement that the ALJ's opinion be supported by substantial evidence.

 The ALJ failed to recognize that in his May 2009 opinion Dr. Hamid explained that the symptoms Claimant suffers from are dyspnea and *intermittent* chest pain. R. 454 (emphasis added). The ALJ thus based part of his decision to discount Dr. Hamid's opinion on the lack of a symptom (i.e. chest pain) in a November 2009 examination which Dr. Hamid already explained would not always be present.  Looking at the medical evidence as a whole, Dr. Hamid explained in his December 2009 opinion that Claimant "does get *intermittent* chest pain which is also *characteristic* of this situation, although the ejection fraction is only mildly diminished." R. 445(emphasis added). In that opinion, Dr. Hamid also explained that "there has been slow, but progressive decrease in her functional capacity" and "[o]ur best hope in the long term would be stabilization of her symptoms or a breakthrough in the medicine which is not available at this point in time." *Id.*

More importantly, using the November 2009 to determine Claimant's cardiac health is inappropriate. The medical record shows that In November 2009 Claimant went to the doctor for a respiratory infection, not for her cardiac issues. R. 447. While Dr. Hamid did say that her cardiomyopathy appeared stable at that point, that was not an occasion in which he did a thorough examination of that health issue and it is unclear what he meant by "stable" in that context. *Id.* Dr. Hamid has consistently stated that Claimant's cardiomyopathy will get worse. R. 454. As mentioned earlier, in May 2009, Dr. Hamid said that looking at the history of this disease pattern within Claimant's family this will get

worse. On December 28, 2009, Dr. Hamid stated, "[t]here has been slow, but progressive decrease in her functional capacity," and on December 7, 2010, he said "[t]he usual history of these conditions is progressive over a period of time." R. 454, 445, 514. A review of Claimant's longitudinal medical record confirms Dr. Hamid's conclusions. In September of 2005, for example, a cardiac catheterization revealed an ejection fraction of 58%, which decreased to 36% by June 2010. R. 311, 517.

That the ALJ relied on one opinion and one medical record culled from a 20-year treatment history seriously cuts against the notion that the ALJ's conclusion is supported by substantial evidence. Relying on one opinion and one medical record culled from the course of a 20-year treatment history is unacceptable cherry picking of the full medical record. *Scott v. Astrue,* 647 F.3d 734, 740. (7th Cir. 2011). The medical record consistently documents Claimant's worsening symptoms, including fatigue, shortness of breath, and chest pain throughout her treatment. R. 289, 292, 295, 299, 301, 303, 305, 324, 457, 456, 451, 448, 534.[5]

The ALJ also explained that he did not credit Dr. Hamid's December 2010 opinion because the medical evidence did not support it. In this regard, the ALJ notes that an ejection fraction of 36% is considered within the "lower range of normal." R. 46. The ALJ also notes Claimant was able to reach 9 METS and exercise for seven minutes in 2008, and in 2009 Claimant was able to reach 10.1 METS and exercise for eight minutes. R. 46. The

---

[5] Further, the ALJ ignored the medical evidence provided by Dr. Wallace completely. Although Dr. Wallace saw Claimant in 2006, before Claimant's alleged disability onset date of October 1, 2008, for purposes of this case, Dr. Wallace's treatment records and his opinions are relevant at least in terms of background for a complete picture of Claimant's medical history. And they are consistent with Dr. Hamid's longitudinal treatment records and opinions. The ALJ summarized some parts of the medical record going back to 2005 (R. 37) but omitted any reference to Dr. Wallace's opinions.

ALJ failed to explain where the conflict lies. All of the cited tests were terminated due to chest pains, chest pressure, shortness of breath, and fatigue. R. 475, 470. Additionally, the June 17, 2010 test, which showed an ejection fraction of 36%, was terminated after nine minutes due to shortness of breath and fatigue. R. 517. The ALJ fails to explain how these tests contradict or undercut Dr. Hamid's opinion when the symptoms on which Dr. Hamid based his opinions are the reasons the tests were terminated and support the Claimant's testimony that she has difficulty doing physical activity for more than fifteen minutes.

The ALJ also took issue with Dr. Hamid's prognosis that Claimant is disabled, stating "[u]ltimate conclusions such as that the claimant is 'disabled' are reserved for the commissioner under the regulations." R. 40. While it is true that such opinions from a treating physician are not entitled to controlling weight (20 C.F.R § 404.1527(e)); the ALJ still must consider the opinion and should recontact the doctor for clarification if necessary. SSR 96-5p at 2.  In addition, if the ALJ's concern was the lack of support for Dr. Hamid's opinion, he had a duty to solicit additional information to flesh out an opinion for which the medical support was not readily discernable. 20 C.F.R. § 404.1527(c)(3); *see also* SSR 96-2 at 4 ("[I]n some instances, additional development required by a case—for example, to obtain more evidence or to clarify reported clinical signs or laboratory findings—may provide the requisite support for a treating source's medical opinion that at first appeared to be lacking or may reconcile what at first appeared to be an inconsistency between a treating source's medical opinion and the other substantial evidence in the case record.").

For all of these reasons, the ALJ should have contacted Dr. Hamid for clarification of any medical questions, asking for more detail or for an explanation of the medical evidence

that Dr. Hamid was relying upon for his opinion that Claimant was disabled. Failure to do so in this case together with the other shortcomings in the ALJ's analysis described above constitutes grounds for remand in this case.

Here, the only evidence that contradicts Dr. Hamid's opinions is the differing opinion of a non-treating physician, Dr. Nimmagadda. A contradictory opinion of a non-examining physician is not, by itself, sufficient for the ALJ to reject a treating physician's opinion. *Gudgel*, 345 F.3d at 470. In addition, SSR 96-2p states that an ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. The ALJ did not do that here.

The ALJ failed to discuss a number of important factors noted in 20 C.F.R § 404.1527 that he will have an opportunity to consider on remand. The ALJ did not mention or discuss the fact that the Claimant has seen Dr. Hamid every one to three months for almost 20 years. R. 522. The ALJ did not mention that Dr. Hamid is a cardiologist. R. 522. The ALJ did not acknowledge that Dr. Hamid had treated other members of Claimant's family, including Claimant's mother, brother, and other relatives with the same genetic condition with "very adverse outcomes". R. 454. The ALJ did not mention that, as a specialist, Dr. Hamid concluded over time that Claimant was "demonstratively worse in symptoms." R. 345. The ALJ did not include the medical record provided by Dr. Wallace, which at minimum shows that prior to Claimant's alleged disability onset she had problems with cervical radiculopathy, familial cardiomyopathy which was slowly degenerating, and that another physician felt that it was serious enough to support temporary disability when Claimant's

ejection fraction was 22% higher than her June 2010 ejection fraction. R. 303, 309, 275, 280. Finally, the ALJ did not discuss the examination performed on Claimant by Dr. Baustista, a physician hired by the DDB, who found that Claimant has chronic low back pain due to spinal stenosis, a history of coronary artery disease, hypertension, and hyperlipidemia. R. 395. This Court does not know if the ALJ gave any weight to these factors, or whether he even considered them at all.

Accordingly, for all of the reasons discussed above, we remand this case for further consideration and explanation along the lines discussed in this opinion.

**B.    On Remand, the ALJ Should Revisit the Issue of Claimant's Credibility**

An ALJ is in the best position to determine the credibility of witnesses, and this Court reviews that determination deferentially. *Craft v. Astrue*, F.3d 536, 538 (7th Cir. 2008). The ALJ has the discretion to discount testimony on the basis of evidence in the record. *Johnosn v. Barnhart*, 449 F3.d 431, 435-36 (7th Cir. 2000). However, the basis for the ALJ's credibility determination must be articulated and "sufficiently specific" to make clear to a claimant and subsequent reviewers the weight given to a Claimant's statements and the reasons for the weight given. SSR 96-7p. The ALJ must consider the entire case record in determining credibility, and statements about the intensity or persistence of symptoms or about the effect of symptoms on functioning may not be rejected simply because they are not substantiated by objective medical evidence. *Id.* While the ALJ notes that he "considered the factors in SSR 96 7p," he made a number of errors that must be addressed on remand.

The gravamen of Claimant's claim is that she cannot work a full-time, competitive job because of, *inter alia*, extreme fatigue, shortness of breath, and chest pains. The ALJ

never deals with this issue. Instead he parses Claimant's testimony concerning the gaps in treatment and her activities of daily living in a manner that does not build a logical bridge to his conclusion that she is not credible in describing the effect her condition has on her day-to-day life.

First, The ALJ found issue with the fact that Claimant has large gaps in receiving treatment for her back pain. R. 45. An ALJ "must not draw inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanation that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatments." SSR 96-7p. The ALJ notes Claimant's lack of treatment for her back pain, and concludes that it is not a financial issue because Claimant has been seen by her current doctor during this time. R. 45. However, the Claimant lost her house in 2008, she lived with relatives for a little while, and had been living in a hotel for nine months at the time of the hearing. R. 60. Further, Claimant testified that she had sporadic Medicaid coverage, which limited her ability to see her physician. R. 59. Finally, Claimant testified that she currently has to borrow money to see her physician, and she has to pay for her medication out of pocket. R. 59-60.

The ALJ seems to believe that if Claimant can seek treatment for one medical issue, she should be able to afford treatment for every issue. The ALJ fails to build a logical bridge between these two pillars of his opinion. Claimant's testimony indicates that she was spending everything she had on her cardiomyopathy treatment. Additionally, the DDB hired Dr. Bautista to perform an examination on Claimant, and diagnosed her with the coronary artery disease, and chronic low back pain. R. 395. During his examination, he

found that Claimant was unable to complete a range of motion tests due to back pain. R. 394. While this is not concrete proof of the Claimant's symptoms, it is documented evidence establishing the existence of this ailment by two separate doctors.

Second, the ALJ found that the medical evidence regarding Claimant's ability to exercise was inconsistent with her testimony that fatigue occurs while sitting or standing. R. 44. To support this, the ALJ refers to the medical record, in which Claimant was able to exercise for 7 minutes and reached 9 METS in 2008, and exercise for eight minutes and reach 10.1 METS in 2010. R. 46. However, the ALJ failed to acknowledge that these tests were terminated due to chest pains, fatigue, or shortness of breath in nine minutes or less. R. 470, 475. The ALJ failed to explain how these results are inconsistent with Claimant's testimony, and her prior statements that she can perform household chores for fifteen minutes before she experiences severe fatigue and has to rest. R. 56, 393.

Third, while the ALJ correctly pointed out that Claimant's ability to perform household chores at her own pace is inconsistent with her testimony that fatigue causes her to be "wholly unproductive" during the day (R 45), the ALJ does not explain how Claimant's activities of daily living are consistent with full time, competitive work. The Seventh Circuit has cautioned that there is a critical difference between activities of daily living and full-time work. *Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir. 2012). Activities of daily living allow a person more flexibility in scheduling, the ability to seek help from others and are do not require a minimum standard of performance as would an employer. *Id.* The failure to recognize these differences, according to the court of appeals, is "a recurrent, and deplorable feature of opinions by administrative law judges in social

security disability cases." *Id.* As the ALJ here does not explain how Claimant's daily living activities translate into fulltime, competitive work the ALJ must revisit the issue.

Thus, for all of these reasons, it is necessary to remand the case to allow the ALJ further opportunity to explain the basis for his adverse credibility determination.

### IV. CONCLUSION

For the reasons set forth above, the Court grants Claimant Zerbinetta Nichols' motion for summary judgment, [Dkt.#20] and remands the case for further proceedings consistent with this opinion.

It is so ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated: August 21, 2013